King, J.
- In this case the plaintiff in error seeks to reverse the judgment of the court of common pleas.
Thomas C, Jones was indicted at the May term, 1896, of the court of common pleas of Wood county, together with one Charles Clark, (whose case has just been decided), and Harry Davis, who has not yet been tried, for the crime of murder in the first degree, it being the charge in the indictment against him that he, with the other two persons named, killed one Jesse Baker on or about the 20th of June, 1896, by shooting him with a pistol.
It was charged in the indictment that this was done purposely and maliciously and of deliberate and premeditated malice, and it was also charged in a second count that it was done while in the perpetration of a burglary.
The first objection in the record appears to have been made by a motion to quash, in which motion it was averred that the indictment was defective in that it charges that the defendant, with two other defendants, then and there held a pistol and discharged- and shot it off against and upon the deceased, which averment, it is claimed, is, in the very nature of the case, impossible. And also that the indictment was *37 not returned and presented to the court, as required by law. That the.indictment was not found or presented at any regular term of the court or at a properly adjourned day thereof, and that the grand jury were not legally empanneled, summoned and sworn, and that the indictment is not signed by the prosecuting attorney, There was also, on the same date, a plea in abatement filed, in which substantially the same allegations were made, except as to the indictment itself.
Now, as to whether the prosecuting attorney is required to sign the indictment, we find no statute requiring that to be done, The code, with reference to the prosecution of criminal cases, defines the duties of the grand jury and the prosecuting attorney, and states what each shall do, and it requires the grand jury to make such presentment as it finds from the evidence should be made, and it shall indorse every bill of indictment “a true bill,” and it shall be signed by the foreman of the grand jury, and there are no other requirements as to the signing of the indictment. Even if jt were required, and omitted, we think that such omission would not be sufficient to authorize the setting aside of the judgment, and that it would be cured by section 7215,_ Revised Statutes, which provides that no indictment shall be deemed invalid for (and it recites many things) “any surplusage, or repugnant allegation, when there is a sufficient matter alleged to indicate the crime and person charged; nor for want of averment of any matter not necessary to be proved; nor for any defect or imperfection which does not tend to the prejudice of the substantial rights of the defendant upon the merits.”
It is alleged in this motion to quash, and also in the plea of abatement, that the act and crime was committed by all three defendants, and that there is no allegation that one of them committed it. They were simply indicted together and charged with the same offense, and we think that was proper. *38 It is not necessary for the indictment to set out which one of these defendants fired the fatal shot. It was proper to allege that all three committed the unlawful act. If the proof showed that the three were, together, and that only one of them did the act and the others were aiding and abetting him, they ahould be charged as principals. Section 6804 reads: “Whoever aids, abets or procures another to commit any offense, may be prosecuted and punished as if he were the principal offender,” and we hold that the word “prosecuted” alludes to the finding of the indictment.
It is urgéd in this motion to quash, and which is more particularly set forth in the plea of abatement, that the indictment was not found at any regular term of court,and that the grandjury were not regularly empanneled, summoned, sworn and charged,and it is set forth that the court had,at a previous time, adjourned to Monday, the 7th of September, 1896, which day, it is alleged, was a legal holiday, and that no orders or decrees of the court could be legally made on that day, and yet- that on that day, the 7th of September, 1896, being a legal holiday, to-wit: Labor Day, the court convened and adjourned to another day, which was not authorized by law, and on such day, and the days following, the jury were empanneled and sworn and charged, and assumed to enter upon their duties, and presented the indictment therein without any legal authority so to do.
It seems that the court, when it adjourned at some previous time, adjourned to September 7th, and this offense having been committed, an order was issued before September 7th, for a special grand jury to be summoned and to appear on September 7th. The court met on September 7th, and the grand jury appeared, pursuant to their summons. The court adjourned at that stage until the next day, September 8th, and the jurors were instructed to report on that day. On September 8th they did report, and the grandjury was duly empanneled. One or more of them *39 were discharged and others substituted in their places according to the statute in such cases provided, and the grand jury being duly charged, went out,on September 8th, to attend to their duties, and on the 9th of September returned this indictment.
We do not think that there was any irregularity in that. Nothing was done or attempted to be done on the 7th of September,except to adjourn court, and if the court had inadvertantly adjourned to Sunday, we know of no reason why it could not, on Sunday, the first day of the week, adjourn until Monday or any other day it saw fit to adjourn to. It was in the nature of an act of necessity. It would not be according to our idea of justice to hold that because the court, by mistake, or inadvertance, adjourned its term to a date on which it could do no business, that it must therefore lapse, and the term come to an end, and yet such would be the effect of declaring that it would have no right to adjourn on September 7th, to the following day.
We think the court could legally adjourn itself to the following day, and the following day it was in session and did empannel the jury. Thereafter a praecipe was filed for a venire of a petit jury under section 7267, which requires the clerk to draw from the jury box as in other cases thirty-six ballots and issue to the sheriff a venire for the persons whose names are so drawn for the day fixed for the trial, which shall be served and returned by the sheriff at least fifteen days before that day. It is claimed that the venire was not returned fifteen days before the day of trial. Whether it was or not, the record does not disclose, and in the absence of such disclosure, we will presume it was so returned; but after it was returned, and when the case was called for trial, the defendant objected to the venire or to the array of jurors whose names were contained therein, and his objection was sustained. The record does not show what the objection was, but as that was done upon the application *40 of the defendant below, of course it was not to his prejudice, and he cannot complain that it was not returned within the statutory period. Thereupon the court made out a special venire upon its own motion for twenty-four more, and gave it to the clerk, and it was issued, and the sheriff took the venire and summoned the jurors, and that action is objected to, and it is claimed that the case should have been contintfe'd, and thirty-six more names drawn from the box.
We think that objection is not well taken. Section 7275 provides that if the whole array be set aside, twelve of such by-standers having the qualifications as aforesaid as may not be set aside on challenge, shall be a lawful jury for the trial of a prisoner charged with an offense the punishment of which is capital. We find no error in the proceedings of the court in its action on that subject.
The next error that is assigned in the order of the trial is the objection that is made to a juror called by the name of John Lundy. Mr. Lundy is called as a juror in the case, and he was inquired of if he had read an account of the homicide in the papers, and he said he had; then he was asked:
“Question: Did the papers which you read purport to give the evidence that was given in the case at the preliminary hearing? A. I think they did.
“Q. At that time you say you formed an opinion from that? A. Yes.
“Q. From the evidence that you read in the newspapers? A. Yes, it looked suspicious.
“Q. You formed an opinion that it looked suspicious; is that true? A. Yes, it looked suspicious that they were guilty.
“Q. Did that opinion go as to the parties then under arrest, of which one of them is now on trial here? A. Yes, I think it did.
“Q. You know that the man now on trial before you is one of the parties who was arrested about that time? A. Yes sir.
*41 “Q. Has anything occurred to change your opinion? A. No, I don’t know as it has.
“Q. Have you that opinion now? A. I have had nothing to change it yet.
“Q. Then you have it yet? A. I probably have.
“Q. Would it take evidence to remove that opinion from your mind? A. Well, perhaps it would.”
Then he says he thinks perhaps it would take evidence to remove it from his mind. Further on he says, in the same examination, that he thinks he could go according to the evidence in the case, and he was challenged at that point by the defendant. The Court then asks him: ‘‘If notwithstanding any opinion you may have, do you feel that you could render a fair and impartial verdict according to the law and the evidence”? And he says, ‘‘I believe I could.”
Q. And could you give to the defendant the presumption of innocence which the law gives him in going into the trial of this case,and throughout the case?”. A. ‘‘Yes, I think I could.”
The challenge was thereupon overruled, and the defendant excepted, and the juror was challenged peremptorily.
The defendant saved that question in the record, and it is presented here for our consideration. The question, I will say, is a little bit troublesome. I would say this further that it would have been better if the court of common pleas had sustained that challenge, since the juror had said that he had formed that opinion from reading a report of what purported to be the evidence in the case,given at a preliminary hearing; but that opinion which I express as to the action of the common pleas court, does not dispose of the question. This is a question that has been very considerably discussed by the Supreme Court in many cases. The case of Palmer v. The State, in 42 Ohio St., page 596, is a case in which it appears that the opinion entertained by a juror was emphatically expressed, and seemed to have been more deeply entertained than in the case at bar, and the court in its opinion of that case seem to imply that there was a distinction between an opinion formed from reading a report of the *42 evidence, and an opinion formed from reading newspaper reports, and the syllabus of the case is to this effect:
“A person called as a juror in a criminal case, who clearly shows himself on his voir dire, not to be impartial to the parties,is not rendered competent by saying that he believes himself able to render an impartial verdict notwithstanding his opinion although the court may be satisfied that he would render an impartial verdict on the evidence.”
And that holding of the court is what we supposed was always known to be the law. But this question has been considered since that in several cases, and, in my judgment, the supreme court has been a little more liberal than the language of that syllabus would seem to indicate. An interesting case is that of McCarty v. The State, in 5th C. C. Rep. page 627, in which that question is discussed. I cannot read all of the discussion, but the court say:
“If it were clear that this prejudice of which the juror speaks, was only the result of the reading of the newspaper article, and was only another mode for stating that he had an opinion in the case based on that, (and nothing to the contrary of this appears in the evidence), we suppose that the court might, if satisfied from the statements of the person that he could lay this opinion or bias or prejudice aside,and render an impartial verdict on the evidence, admit him as competent — for a prejudice or prejudgment as to the merits of the case, is in one sense only the formation of an opinion on any evidence or statements before him. If it goes beyond this, and has produced a hard feeling of hostility to the accused, such person should not be allowed to sit as a juror. But we cannot say that such feeling is in any way shown here,and while in our judgment it would have been better to have excused him, we do not feel clear that the court erred in refusing to do so.”
In the 38th Ohio St., page 153, in the case of McHugh v. The State, the court say that:
“A person summoned as a juror, who states upon his voir dire that he has formed or expressed an opinion touching the *43 innocence of the accused, is prima facie incompetent, and such prima facie incompetency is not removed until it has been made to appear that such opinion was formed from reading mere newspaper statements, communications, comments or reports, or upon rumor or hearsay, and not upon conversations with witnesses of the transaction, or reading reports of their testimony,or hearing them testify, and that, notwithstanding such previously formed or expressed opinion the juror is able to render an impartial verdict upon the law and the evidence.”
And in Doll v. State, in 45 Ohio St., reading from the opinion on page 446, it is said that the opinion in that case was not formed from reading the testimony of witnesses, or conversations with them,but merely from reading newspaper reports of ihe testimony, and the juror testified on examination that he would, if selected,render a fair and impartial verdict and it appears that the court by accepting him was of that opinion, and he was therefore a competent juror.
But a later and rfiuch stronger case is found in the 46th Ohio St. Rep., page 457. In that case the juror conversed with the father of the deceased on the day of the tragedy, and with others who claimed to have been eye witnesses and described all about it with probably such coloring as their own fancy may have inspired, and the court having put the question which is required by the statute, whether notwithstanding his opinion,could he render a fair and impartial verdict according to the law and evidence, and the juror answering that.he could, on page 461 of the opinion the court say:
“The court did not expressly find that it was satisfied that the juror could render an impartial verdict in the case, but the fact of admitting him as a juror must be taken to include, by necessary implication, a finding by the court that it was satisfied of his impartiality. The trial court had before it the juror and his statements. We have these statements embodied in a bill of exceptions,from which it appears not only that the juror had read an account of the case in a newspaper, but had received from the father of the deceased, a narra *44 tive"of the circumstances of the homicide, and hád atone time formed an opinion respecting the guilt of the principal. Under that state of fact, to admit him as a juror was an extreme application of the discretion permitted by the statute; yet, standing by itself, it is not such an abuse of that discretion as to warrant a reversal of the judgment on that ground alone; but in view of the difficulty nearly all men experience in getting rid of opinions based upon hearing a detail of the circumstances of a transaction by one who professes to know them, it might well become an important factor in the case, were we reviewing the whole record to ascertain if a fair trial had been had and substantial justice done.”
Well now, as far as opinions go, we think the opinion in that case goes further then all the others that have been cited. To my mind it would have made a stronger impression on the mind of the juror to talk with the father of the one who was murdered than such as he would have formed by reading a newspaper report of the testimony, and I would regard an opinion formed under these circumstances as being more firmly fixed than in the case in the 42nd Ohio St, where it was formed from reading newspaper reports. And now in this case, this juror (Lundy) said he had read a newspaper report in June, and he was called in November as a juror, and he says that on reading that he formed an opinion. He formed it from reading the testimony at the preliminary hearing, and it was based on that, and that alone. It does not disclose that he was not otherwise a fair-minded man; nor does it disclose that he was a man who might not divest himself of the opinion formed under such circumstances and listen to the evidence and apply to it the evidence of the case as given by the court. The court seems to have come to that conclusion and allowed the juror to sit, and unless this case should be one in which the defendant had not had a fair trial, we should not deem that as being in and of itself a sufficient ground for reversal.
*45 That brings me to the consideration of the question whether this verdict is against the weight of the evidence.
The defendant was found guilty of murder in the second degree as he stood charged in the first count in the indictment, and not guilty on the second count. The reason urged here why this is contrary to the evidence is that it is claimed that the case shows clearly that this defendant, though at one time engaged with his co-defendants in the commission of the crime of burglary; though it is said that they went to the place where they were for the purpose of the crime of burglary, and were actually engaged in its commission when they were alarmed, yet, on hearing the alarm, that this defendant quit the other two and ran away in an opposite direction, and did not join them until after the commission of this crime.
That claim is based upon the testimony of the defendant himself,and upon the testimony of the defendant Clark who was indicted with him, and subsequently tried. There are perhaps other circumstances which it is claimed corroborate their story. There is the circumstance testified to by other witnesses,that they saw two persons running away from the scene of the burglary,and that these two persons were pursued by a man. They saw two persons, and did not testify to seeing three persons running away from the scene of the burglary,nor at the time of the firing of the pistol shots, and that is claimed to be corroborative to the defendant’s story that he ran in another direction.
The place where Baker was shot was four or five feet away from the rear of the post-office which was being burglarized ; and the place where Baker was shot could be reached from the rear of the post-office by passing down an alley in a southerly direction and along the right of way of the B. & O. railroad easterly, or it could be reached by running down an alley going in an easterly direction until you reach it. The distance was about the same, or perhaps the *46 distance by running down the easterly alley was fifty or sixty feet further. At all events, it was not more than four hundred feet by either route to the place where Baker was shot, and the testimony of the defendant is that he ran down the eastern alley along to Tarr street south, and at some time in his flight passed the place where Baker was shot; that he ran on he claims before his co-defendants had reached that point,and hid himself under a car, and his co-defendants, he claims,came the other way,and one of them, and he don’t know which is the one, shot Baker. He testified that he fired no shot.
It will be observed that this separation. was for an instant only, probably not more than two minutes elapsed, and the men were all in hailing distance of each other, and Jones did not separate from the others in his flight to such an extent that it might be said he had entirely quitted his co-defendants, and could not be held to be responsible for anything they did in his absence. But upon that point there is testimony in the record that positively identifies the man who went south, and east on the B. &. O. right of way. evidence uncontradicted — evidence, from anything that appears in the record,the jury might well have believed. Evidence that seems to have been given by aman who was there, who was competent to observe, and who did observe, and who was the first man upon the ground upon the second day following when these men were captured, He says at that time, and the next time he saw this defendant, he recognized him as the man who came down the alley, and was rnning away from the night watchman Baker when'he fired. If this testimony is to be believed, the jury might well have found that Jones fired the fatal shot, as he says there were two men , one larger than the other, and the smaller man fired this shot,and the larger man stood a few feet back.
There is also testimony that immediately after the shot was fired, these men were running down the B. &. O. track,and *47 not one hundred feet away from the street crossing the three men were together in flight, and that testimony is wholly uncontradicted by anyone except the defendant himself, and I don't know that he contradicts it. In fact, it is not clear from his testimony to what point he did run. He says he ran to a car and got under it; whether that was further away than the witness McCurdy claims I don’t know,but McCurdy claims to have seen them running along the track, and they were all of them together, and talking about what they had done.
Now we think from all that evidence, either taking the defendant’s own story for it, excepting where he testifies to' his conclusions and intentions, taking what he states to be the facts, or the story of other witnesses, the jury were justified in finding that these three men were together all the time aiding and abetting .each other, The purpose of the escape was as much a part of the act they were engaged in that day as was the purpose of breaking into .the post-office.
They formed the intention — he testified to that — that if necessary for them to run away, they would come down this very path and along this railroad right of way, and escape in that direction, and the mere temporary absence of one from the others the distance of a block or a half block,is not such an absence as would authorize us to say upon the record that the defendant had absented himself from the originally form - ed purpose and intention of these parties to commit this burglary.
Three men agree that they will commit a burglary, and. they arm themselves with revolvers of an approved pattern, which they clean, prepare and fix the day before, and load, with the intent to do what? To commit a burglary with revolvers. They had a kit of burglar’s tools, but these revolvers were for other purposes. They had these revolvers; *48 for the purpose that all burglars have revolvers; that if taken in their depredations, they would take human life if necessary in order to escape, and this man was a party to the job of the three men who committed this burglary, and they committed murder while escaping from the place of the first crime. And we think the jury were right in finding this man guilty, as they did Mr. Clark, of murder in the second degree.
Wade, Dunn & Jones, for Plaintiff in Error
JE. Gt, McClelland, Pros. Atty. and B. 8, Parker, for State.
We find no error in the record, and holding as we do that this defendant had a fair trial and was fairly and properly convicted, we affirm the judgment.